COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                              NOS.  02-08-287-CR

       02-08-288-CR

               02-08-289-CR      

 

JOSE MONTOYA                                                                               APPELLANT

 

                                                             V.

 

THE STATE OF TEXAS                                                                             STATE

 

                                                       ------------

 

               FROM
THE 362ND DISTRICT COURT OF DENTON COUNTY

 

                                                       ------------

 

                                      MEMORANDUM OPINION[1]

 

                                                       ------------

I.  Introduction

Appellant
Jose Montoya appeals his convictions for two counts of aggravated assault and
one count of murder.  In two points,
Montoya contends that (1) the trial court erred by failing to give proper jury
instructions and (2) the trial court abused its discretion by admitting a
videotape recording of his oral confession. 
We affirm.  








II.  Factual and Procedural Background

A.  The Incident

In
June 2007, Montoya lived in an apartment with Rosa Lopez, Rosa=s
adult daughter Claudia Escoto, and another man named Isaac Scott.[2]  On the night of June 2, Rosa and Claudia were
in one of the apartment=s bedrooms,[3]
discussing the need to move out if Montoya would not leave, when they heard a
knock at the bedroom door.  Rosa opened
the door to see Montoya standing there.








After
a brief discussion, in which Rosa told Montoya that he needed to move out,
Montoya grabbed Rosa by the neck and hit her in the face multiple times.  Rosa fell back onto the bed and attempted to
defend herself with her feet.  Montoya
then pulled a knife from behind his back and stabbed Rosa a total of nine times
on her hands, arms, and back.  In an
effort to protect her mother, Claudia interceded and Montoya stabbed her a
total of seven times on her arms and stomach. 
Claudia yelled for Isaac, who was asleep in the kitchen, to come and
help.  When Isaac came into the room, he
asked, AWhat=s
happening, [Montoya]?@  Montoya turned and fatally stabbed Isaac in
the chest.[4]  As Montoya approached Rosa again, Rosa said, ABy
God=s
love, what have we done to you?  Be
fearful of God.  Think about your
children.  You are getting yourself into
a big problem.@  While Rosa was speaking, Claudia managed to
take the knife from Montoya.  Montoya
then left the apartment.

Officers
with the Carrollton Police Department apprehended Montoya later that night,
arrested him, and took him to jail. 
After taking Montoya=s
fingerprints and photograph, detention officers placed him into the jail=s
detox center.  About sixteen hours later,
Carrollton Police Detective Angela Lundy interviewed him, using an
interpreter.  After Detective Lundy read
Montoya his Miranda[5]
rights, he confessed on videotape to the details of the attacks. 








During
the interview, Montoya confessed to the following.  He and Claudia were in a relationship that
Rosa did not approve of.  Rosa wanted
Montoya to move out of the apartment.  On
the night of the incident, he had drunk six or seven beers and done Aabout
20A in
cocaine.[6]  He had overheard Rosa and Claudia making
plans to get him out of the apartment and responded by taking a knife from the
kitchen.  After being admitted into the
bedroom, he had asked Rosa why she was Atrying
to kick [him] out of the apartment.@  Rosa responded that Athat
was what [he] deserved . . . .@  Rosa=s
response made him angry, so he attacked her. 
He attacked Claudia and Isaac when they tried to intervene.  He did not have any problems with Isaac and
only stabbed him because Isaac had tried to stop him from attacking Rosa and
Claudia.  He Aregret[ted]
not having done what [he] wanted to do with whom [he] wanted to instead [he]
did it to the person who did not deserve it.@  Finally, when asked if he wanted to kill
Rosa, Montoya responded,  AThe
problem was with Rosa, maybe not kill her, I don=t
know.@

The
State charged Montoya with two counts of aggravated assault and one count of
murder. 

B.  Trial on the Merits

At
trial, in addition to Rosa and Claudia both testifying to the facts stated
above, Sergeant Joel Payne with the Carrollton Police Department testified that
on June 2, he responded to a dispatch call regarding an aggravated
assault.  On his way to the location of
the assault, he stopped a vehicle matching the description of the suspect=s
vehicle.  When he ordered the driver,
later identified as Montoya, to step out of the car, Montoya refused, asking in
English, AWhy
are you stopping me?@  At some point, Montoya drove off, and
Sergeant Payne pursued him in his patrol unit. 
During the chase, Montoya=s
vehicle collided with a wall.  Montoya
then took off on foot.  Police officers
gave chase, apprehended Montoya, and placed him under arrest. 








James
Robertson, a detention officer for the Carrollton Police Department, testified
that he assisted in Montoya=s
book in process.  He stated that during
intake, Montoya smiled, laughed, and said, AI
stabbed them, and I killed him@ and
A[s]he
deserved this.@  When asked if he spoke Spanish, Robertson
responded, ANo.@  When asked if he had any difficulty
communicating in English with Montoya, Robertson again responded, ANo.@ 

Detective
Lundy testified that she spoke with Montoya about sixteen hours after the
offense occurred.  She stated that she
read Montoya his Miranda rights before questioning him.  When asked about her interaction with Montoya
during questioning, Detective Lundy responded:

Q.  Now, do youCdid
you make any promises to [] Montoya?

A.  No, I did not.

Q.  Did you threaten him in any way?

A.  No.

Q.  Did he ever ask to speak to an attorney?

A.  No, he didn=t.

Q.  Did he ever ask to terminate the interview in
any fashion?

A.  No, he did not.

Q.  Do you believe that when you read him his
rights that he    fully understood them?

 

A.  Yes, I do.

Q.  And how did you make sure he understood them?

A.  Well, I believe that Mr. Montoya spoke
English; but just      to make sure that
he understood fully what was going on, because
these charges were very serious, I provided an     interpreter
to interpret our interview.

 








Detective
Lundy also testified that the interpreter was Aan
experienced interpreter@ who interpreted for the
local municipal court.  Finally,
Detective Lundy stated that Montoya did not seem to be intoxicated or under the
influence of drugs when she questioned him. 


Outside
the presence of the jury, Montoya objected to the admission of the videotaped
recording and transcription of his confession, claiming that his confession was
not voluntary because he had not waived his Miranda rights knowingly,
intelligently, and voluntarily.  The
trial court overruled Montoya=s
objection, and it allowed the videotape and transcript to be admitted as
evidence. 

At
the close of evidence, Montoya did not request a jury instruction on the
voluntariness of his confession, and none was given.  A jury found Montoya guilty on all three
counts and assessed punishment at fifteen years=
confinement for each count of aggravated assault and seventy-five years=
confinement for the murder.  The trial
court sentenced Montoya accordingly. 

C.  Procedural History

Montoya
filed his notice of appeal and then filed an AAppellant=s
Motion to Abate for Trial Court=s
Entry of Mandatory Findings of Fact and Conclusions of Law Regarding
Voluntariness of the Appellant=s
Confession.@  We abated, and the trial court entered the
following findings of fact and conclusions of law:








I find that the
defendant was given all of his rights by Detective Lundy, per Texas Code of
Criminal Procedure Article 38.22 Sec. 2 as required for custodial
interrogation, and that the rights are contained on the video.  These rights were given prior to any
questions by Detective Lundy.  I find
that the defendant understood these rights in a knowing and intelligent way.  I find the defendant appeared alert and aware
on the video.  He did not appear
intoxicated or confused in any way.  I
find that the interview was taken approximately at 4 p.m. and over 16 hours
after the offense and arrest of the defendant. 
He communicated back and forth with Detective Lundy, through the
interpreter, a great deal during the interview. 
There was never a moment where communication broke down or that the
defendant appeared confused.  He answered
appropriately, in proper context, to all the questions he was asked; indicating
knowledge and understanding.

 

I find that the
defendant knowingly, intelligently, and voluntarily waived the rights set out
in Article 38.22.  I find that after a
full and complete reading of his 38.22 rights, Detective Lundy sought a waiver
of these rights.  Detective Lundy asked
the defendant, through the interpreter, AAre you willing to tell the detective what
happened last night?@  I find that the defendant responded
precisely, and directly to that question: ASi,@ translated to >yes=.  I find that the defendant=s 1st waiver answer
was soft spoken and that Detective Lundy appeared to not have heard the
defendant.  Therefore she asked again,
through the interpreter, for a waiver of his 38.22 rights, ADo you want to tell
the detective what happened?@  I find that the defendant answered precisely
and directly to that request for a waiver of rights, ASi,@ translated as >yes=.  I find these two questions legally sufficient
for a waiver request of 38.22 rights.  I
find that the defendant understood these two questions as a request for a
waiver of his rights.  I find the
defendant then waived his rights.

 








I find that the
defendant=s statement to
Detective Lundy, what became State=s #102, was voluntarily made.  From my viewing of the video, I do not find
the interview to be coercive in any fashion. 
The interview was calm and without confrontation. All the voices were of
regular conversational tone.  I find the
body language of the parties in the interview room to be inconsistent with
tension, threats, or coercion.  No one
yelled at the defendant. No one demanded answers from him.  The defendant was not threatened in any way.  I find Detective Lundy credible when she
testified that no one made any promises to the defendant, or threatened him in
any way, and that the defendant did not request an attorney, or request to
terminate the interview.  In the video
itself I find there are no threats, no promises, no request of counsel, or
request to terminate the interview.  I
find that the defendant waived his rights of his own free will.  His will was not overcome by the State,
indeed the State made no effort to coerce the defendant in any way.  I find that the defendant made his statement;
State=s #102, freely and
voluntarily, without threat or promise.

 

From the totality of
the circumstances, I find that the defendant=s statement, exhibit #102, was freely and
voluntarily made.  The statement was made
after he received a complete and accurate reading of his rights under TXCCP
38.22, sec. 2, and the warnings are contained in the electronic recording, the
video.  I find that the defendant
knowingly, intelligently, and voluntarily waived the rights set out in 38.22,
before any questioning.  I find that the
defendant gave the statement of his own free will. 

 

This
appeal was reinstated following the entry of these findings and conclusions.

III.  Jury Instruction

In
his first point, Montoya claims he suffered egregious harm because the trial
court did not instruct the jury under sections 6 and 7 of article 38.22 of the
Texas Code of Criminal Procedure as to the voluntariness of his statements to
Detective Lundy.  In response, the State
concedes that a section 6 general voluntariness instruction should have been
given but argues that Montoya failed to raise any evidence that would have
entitled him to a section 7 instruction. We disagree with the State=s
concession as to the section 6 instruction but agree with its argument as to
the section 7 instruction.

A.  Standard of
Review








Appellate
review of error in a jury charge involves a two-step process. Abdnor v.
State, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994); see also Sakil v.
State, 287 S.W.3d 23, 25B26
(Tex. Crim. App. 2009).  Initially, we must
determine whether error occurred.  If it
did, we must then evaluate whether sufficient harm resulted from the error to
require reversal.  Abdnor, 871
S.W.2d at 731B32.

B.  Applicable Law








A
statement of an accused may be used as evidence against him if it appears that
it was freely and voluntarily made without compulsion or persuasion.  Tex. Crim. Proc. Ann. art. 38.21 (Vernon
2005).  There are several theories that a
defendant may use to argue his statement was not freely and voluntarily made
and thus may not be used as evidence against him:  (1) article 38.22, section 6 (Ageneral
voluntariness@);
(2) Miranda as codified in Texas Code of Criminal Procedure article
38.22, sections 2 and 3; or (3) the due process clause.  Oursbourn v. State, 259 S.W.3d 159,
169 (Tex. Crim. App. 2008).  The theory
of involuntariness determines whether and what type of a jury instruction is
appropriate.  Id.   Article 38.22 of the code of criminal
procedure governs the admissibility of an accused=s
written and oral statement that results from custodial interrogation.  Id. at 171.  However, section 6 of article 38.22 applies
to both an accused=s custodial and noncustodial
statements, requiring that even noncustodial statements must be voluntary to be
admitted.  Id.  When a claim is raised under article 38.22, a
Ageneral@
voluntariness instruction may be appropriate. 
Id. at 174.  The types of Ageneral@
instructions that may be appropriate include an article 38.22, section 6
voluntariness instruction and an article 38.22, section 7 warnings instruction
(regarding the warnings required by sections 2 and 3).  Id. at 173.  It is the defendant=s
responsibility to delineate which type of Ainvoluntariness@ he
is claiming so that the judge can determine the appropriate instruction.  Id. at 174.

A
trial court Ahas
an absolute sua sponte duty to prepare a jury charge that accurately sets out
the law applicable to the specific offense charged.@  Delgado v. State, 235 S.W.3d 244, 249
(Tex. Crim. App. 2007); see Tex. Code Crim. Proc. Ann. art. 36.14
(Vernon 2007).  When a statute, such as
article 38.22, requires an instruction under certain circumstances, that
instruction is Alaw applicable to the case,@ and
the trial court must instruct the jury on what is required under the
statute.  Oursbourn, 259 S.W.3d at
180.

C.  Discussion

At
trial, Montoya made the following objection, outside the presence of the jury: 

[M]y objection is under 38.22, section
3(a)(2), wherein the oral statement is required to demonstrate that the accused
knowingly, intelligently, and voluntarily waived any rights set out.

 

We hear the Miranda warning read to theCto Mr. Montoya.
However, the question that he answers Ayes@ to is, Ado you want to speak to me?@  There is never any indication that [Montoya]
directly understood, that he acknowledged that he understood Miranda and
its consequences.  

When [Montoya] is asked initially,
immediately after the Miranda warning is given, he does not answer, and
the officer begins to have further discussionCdiscussions with him
that I think can be taken almost as if it=s aCsome sort of promise of leniency or something
of that nature.@ 

 








1.  Article 38.22, section 6

Article
38.22, section 6 becomes Alaw applicable to a case@
once a question is raised and actually litigated as to the general
voluntariness of an accused=s
statement; however, a factual dispute is not necessary.  Id. at 175B76,
180.  A question of voluntariness is
raised when a party notifies the trial court or the trial court raises the
issue on its own.  Id. at
175.  A claim under section 6 that an
accused=s
statement was made involuntarily may include situations involving police
overreaching, youth, intoxication, illness or medication, mental
incapacitation, or other disabilities.  Id.
at 172B73.
Although, these fact scenarios alone are not enough to render a statement
inadmissible, they are factors a jury is entitled to consider when armed with a
proper instruction.  Id. at 173.

The
court of criminal appeals has stated that the sequence of events contemplated
by section 6 is as follows:

(1) a party notifies the trial judge that
there is an issue about the voluntariness of the confession (or the trial judge
raises the issue on his own); (2) the trial judge holds a hearing outside the
presence of the jury; (3) the trial judge decides whether the confession was
voluntary; (4) if the trial judge decides that the confession was voluntary, it
will be admitted, and a party may offer evidence before the jury suggesting
that the confession was not in fact voluntary; (5) if such evidence is
offered before the jury, the trial judge shall give the jury a voluntariness
instruction.  

 

Id. at
175 (emphasis added).








Here,
we agree with Montoya=s assertion that he raised
the issue of voluntariness to the trial court when he objected, outside the
presence of the jury, to the voluntariness of his statement under article
38.22.[7]  We disagree, however, with his conclusion
that he offered evidence before the jury, thereby mandating the requested jury
charge instruction.

Under
article 38.22, there is no error in refusing to include a jury instruction when
there is no evidence before the jury to raise the issue.  Miniel v. State, 831 S.W.2d 310, 316B17
(Tex. Crim. App. 1992); Hernandez v. State, 819 S.W.2d 806, 812 (Tex.
Crim. App. 1991) (citing Wagner v. State, 687 S.W.2d 303, 307 (Tex. Crim.
App. 1984)), overruled on other grounds by Fuller v. State,
829 S.W.2d 191 (Tex. Crim. App. 1992). 
Some evidence must have been presented to the jury that the defendant=s
confession was not given voluntarily.  Alvarado
v. State, 912 S.W.2d 199, 211 n.9 (Tex. Crim. App. 1995); Hernandez,
819 S.W.2d at 812 (citing Brooks v. State, 567 S.W.2d 2 (Tex. Crim. App.
1978)). 








We
note that Montoya does not discuss, or provide a citation to, any evidence before
the jury showing that the issue of voluntariness was actually litigated.  Instead, he cites only to the arguments that
he raised outside the presence of the jury. 
Upon independent review of the record, we cannot find where Montoya
testified before the jury, called witnesses, or cross-examined the State=s
witnesses on the issue of voluntarinessCthat
is, there is no testimony pertaining to Detective Lundy=s
alleged promise of leniency.[8]  In fact, the only testimony pertaining to the
voluntariness of Montoya=s statement came during the
State=s
direct examination of Detective Lundy.  See
Brooks, 567 S.W.2d at 3 (holding that evidence presented by the State in
anticipation of an attack upon the voluntariness of a confession does not put
voluntariness in issue).  Thus, because
the parties did not litigate the voluntariness of Montoya=s
statement before the jury, the trial court did not err by not including a
section 6 instruction sua sponte in the jury charge.  See Hernandez, 819 S.W.2d at 812B13
(holding appellant was not entitled to a section 6 instruction because he
failed to present evidence to the jury that his statements were not given
voluntarily); see also Aldaba v. State, No. 14-08-00417-CR, 2009 WL
1057685, at *3 (Tex. App.CHouston [14th Dist.] Apr.
16, 2009, pet. ref=d) (concluding trial court
was not on notice that a section 6 instruction might be required where the
parties did not litigate the voluntariness of appellant=s
statements in some manner).








2.  Article 38.22, section 7

Article
38.22, section 7 becomes Alaw applicable to a case@
when the evidence raises an issue regarding (1) law enforcement=s
compliance with the statutory warnings set out in Texas Code of Criminal
Procedure article 38.22, sections 2B3
and (2) the voluntariness of a defendant=s
waiver of his rights. Oursbourn, 259 S.W.3d at 176.  An issue is Araised
by the evidence@ if there is a genuine
factual dispute.  Id.  A genuine factual dispute occurs when the
defendant offers evidence that would create a reasonable doubt as to a specific
factual matter that relates to compliance with the statutory warnings of
sections 2 or 3 of article 38.22 and is, therefore, essential to the
voluntariness of the statement.  See
id. at 177.  When there is no
disputed factual issue, the legality of compliance with the statutory warnings
regarding the statement is determined by the trial court alone, and a section 7
instruction is not required. Id. at 177B78.

Section
3 of article 38.22 provides that no oral statement of an accused made as a
result of custodial interrogation shall be admissible against the accused in a
criminal proceeding unless (1) the statement was recorded and (2) prior to the
statement but during the recording, the accused was warned of his rights and
knowingly, intelligently, and voluntarily waived those rights.  Tex. Code Crim. Proc. Ann. art. 38.22, ' 3
(Vernon 2005).  The warning must inform a
defendant of the following rights:








(1) [H]e has the right to remain silent and
not make any statement at all and that any statement he makes may be used
against him at his trial;

 

(2) any statement he
makes may be used as evidence against him in court;  

 

(3) he has the right
to have a lawyer present to advise him prior to and during any questioning;          

 

(4) if he is unable to employ a lawyer, he
has the right to have a lawyer appointed to advise him prior to and during any
questioning; and

 

(5)
he has the right to terminate the interview at any time[.]

Id.
art. 38.22, ' 2. 

Here,
although Montoya=s statement was clearly made
as a result of a custodial interrogation, he cites no facts to support his
argument that the trial court should have included a section 7
instruction.  Rather, Montoya states only
that the Aissue
was raised.@  After an independent review, however, we can
find no evidence disputing Detective Lundy=s
compliance with the statutory warnings set out in article 38.22, sections 2 and
3 or the voluntariness of Montoya=s
waiver of those rights.  Thus, the trial
court did not err by failing to include a section 7 instruction sua sponte in
the jury charge.

D.  Conclusion








Because
Montoya was not entitled to instructions under sections 6 and 7 of article
38.22, the trial court did not err by failing to submit a jury charge on the
question of voluntariness.  See White
v. State, 779 S.W.2d 809, 827 (Tex. Crim. App. 1989) (concluding appellant
was not entitled to section 6 instruction); see also Brownlee v. State,
944 S.W.2d 463, 467B68 (Tex. App.CHouston
[14th Dist.] 1997, pet. ref=d)
(concluding no error occurred in failing to submit a section 7 instruction on
voluntariness).  Accordingly, we overrule
Montoya=s
first point.

IV.  Admission of Evidence

In
his second point, Montoya asserts that the trial court abused its discretion by
admitting the videotape of his oral confession after he timely objected on the
ground that the confession had been obtained in violation of article 38.22 of
the code of criminal procedure.

A.  Standard of Review

An
appellate court may not disturb a trial court=s
evidentiary ruling absent an abuse of discretion.  Winegarner v. State, 235 S.W.3d 787,
790 (Tex. Crim. App. 2007).  In other words,
as long as the trial court=s
decision was within the zone of reasonable disagreement and was correct under
any theory of law applicable to the case, it must be upheld.  Id. (citing Montgomery v. State,
810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh=g)).  This is so because trial courts are usually
in the best position to make the call on whether certain evidence should be
admitted or excluded.  Id.

B.  Applicable Law








As
discussed above, under article 38.22, section 3, an oral statement resulting
from a custodial interrogation is admissible only if an officer warns the
defendant of his Miranda rights and the accused executes a knowing,
intelligent, and voluntary waiver of those rights.  See Tex. Code Crim. Proc. Ann. art.
38.22, ' 3; see
also Penry v. State, 903 S.W.2d 715, 744 n.24 (Tex. Crim. App. 1995)
(stating that Texas statutory warnings codified in article 38.22 comply with Miranda).

To
determine whether an accused effectively executed a valid waiver of rights, we
must decide whether the waiver was a Aproduct
of a free and deliberate choice rather than intimidation, coercion, or
deception.@  Moran v. Burbine, 475 U.S. 412, 421,
106 S. Ct. 1135, 1141 (1986); Ripkowski v. State, 61 S.W.3d 378, 384
(Tex. Crim. App. 2001).  We must also
determine whether the waiver was given Awith
a full awareness of both the nature of the right being abandoned and the
consequences of the decision to abandon it.@ Moran,
475 U.S. at 421, 106 S. Ct. at 1141; Ripkowski, 61 S.W.3d at 384. An
express waiver is not necessary, and the trial court may find facts and
evidence sufficient to support an inference of waiver.  See Rocha v. State, 16 S.W.3d 1, 12
(Tex. Crim. App. 2000).  We consider the
totality of the circumstances when determining whether an accused effectively
waived his rights and thereby made a statement voluntarily.  Moran, 475 U.S. at 421, 106 S. Ct. at
1141.

C.  Discussion

 

The
pertinent portions of Detective Lundy=s
interview, along with what the interpreter said translated into English, are as
follows:








Lundy:  Before we talk I need to read you your Miranda
warning. 

 

Interpreter:  Before you talk she needs to tell you your
rights.

 

Lundy:  OK. 
Says you have the right to remain silent and not make any statement. 

 

Interpreter:  Says you have the right to remain quiet and
not make any statement.

 

Lundy:  And any statement you make may be used against
you at your trial.

 

Interpreter:  And if you make a statement it can be used
against you as evidence in a trial.

 

Lundy:  Any
statement you make may be used as evidence against you in court.

 

Interpreter:  Any statement you make can be [sic] as
evidence to go to court.

 

Lundy:  You
have the right to have a lawyer present to advise you

 

Interpreter:  You have the right to hire an attorney to
advise you

 

Lundy:  prior
to and during any questioning.

 

Interpreter: prior to and during
any interview or questioning.

 

Lundy:  If
you=re unable to employ a
lawyer

 

Interpreter:  If you=re unable to employ a lawyer

 

Lundy:  you
have the right to have a lawyer appointed to advise you

 








Interpreter:  you have the right to have a lawyer assigned
to advise you.

 

Lundy:  prior to and during any questioning

 

Interpreter:  prior to and during any interview or
questioning

 

Lundy:  and
you have the right to terminate this interview at any time.

 

Interpreter:  and you also have the right to stop this
interview at any moment.

 

Lundy:  Are
you willing to talk to me?

 

Interpreter:  Are you willing to talk to the detective?

 

Lundy:  I
just want to hear your side of the story. 
I know what happened last night. 
I just want to hear what you have to say about that >cause I know there=s got to be an
explanation for you getting so upset and so angry last night.

 

Interpreter:  The detective is saying that she already knows
what happened last night.  She only wants
to hear your side of the story.  She
understands that maybe something happened to you that bothered you very much.

 

Lundy:  I
want to hear your side of the story.

 

Interpreter:  She only wants to hear your side of the
story.

 

Lundy:  Are you willing to tell me what happened?

 

Interpreter:  Are you willing to tell the detective what
happened last night?

 

Lundy:  Rosa
and Claudia, they=re going to be fine.

 

Interpreter:  Rosa [and] Claudia are going to be fine.








[Montoya:] 
Yes.

 

Lundy:  But
you know that Isaac . . . died last night.

 

Interpreter:  But you know that Isaac . . . um . . . died
last night.

 

Lundy:  The
baby, the baby is fine.

 

Interpreter:  The baby is fine.

 

Lundy:  So,
can you tell me what happened?

 

Interpreter:  Do you want to tell the detective what
happened?

 

[Montoya:]  Yes.

 

Montoya
claims that, because he Anever gave any verbal or
nonverbal indication that he either understood [his] rights or wished
to waive them,@ he did not intelligently,
knowingly, and voluntarily waive those rights. [Emphasis in original.]  In addition, Montoya asserts that the
interpreter=s
imprecise translations led to miscommunications regarding his rights.  Because Montoya does not challenge the
validity of his waiver on the ground that it was the product of intimidation,
coercion, or deception, we need only determine whether Montoya=s
waiver was given Awith a full awareness of
both the nature of the right being abandoned and the consequences of the
decision to abandon it.@  Moran, 475 U.S. at 421, 106 S. Ct. at
1141; Ripkowski, 61 S.W.3d at 384.

1.  Warnings:  Fully Effective Equivalent








First,
we note that warnings do not have to be given verbatim to be valid.  See Bible v. State, 162 S.W.3d 234,
240 (Tex. Crim. App. 2005) (explaining that a warning is sufficient if it is
the Afully
effective equivalent@ of the warning outlined in
article 38.22, section 2).  Montoya
claims that the interpreter=s
translation of Aread you your Miranda
warning@
into Ashe
needs to tell you your rights,@
among other translations, led to miscommunications of his rights.  This particular statement by Detective Lundy,
however, is not part of the warning recited in section 2 of article 38.22 and,
therefore, is not required to meet the Afully
effective equivalent@ standard.  Moreover, in analyzing the portion of the
interview that does contain the warning recited in section 2 of article 38.22,
we conclude that the interpreter=s
word choices do not convey a different meaning from those used by Detective
Lundy or the statute.  See Bennett v.
State, 742 S.W.2d 664, 677 (Tex. Crim. App. 1987), vacated on other
grounds, 486 U.S. 1051 (1988) (concluding that the substitution of the word
Atrial@ for
Acourt@ and
the word Amay@ for
Acan@ in
the warning given to appellant did not dilute the meaning or import of the
warning recited in section 2 of article 38.22). 
Thus, the interpreter=s
translation of Montoya=s rights are the fully
effective equivalent of those stated in the statute.

2.  Waiver of Rights








We
next address the validity of Montoya=s
waiver.  The record shows that no express
waiver of Montoya=s rights appears on the
recording.  However, Athe
law does not require that the recording reflect an express waiver of [] rights.@  Rocha, 16 S.W.3d at 12 (citing Etheridge
v. State, 903 S.W.2d 1, 16 (Tex. Crim. App. 1994), cert. denied, 516
U.S. 920 (1995)).  A waiver of rights may
be inferred from the actions and words of the person interrogated.  State v. Oliver, 29 S.W.3d 190, 191B92
(Tex. App.CSan
Antonio 2000, pet. ref=d) (citing Barefield v.
State, 784 S.W.2d 38, 40B41
(Tex. Crim. App. 1989), overruled on other grounds by Zimmerman v. State,
860 S.W.2d 89 (Tex. Crim. App. 1993)).








Montoya
argues that in the cases in which courts have held that an express waiver is
unnecessary, there was, however, at least evidence that the defendant
acknowledged his understanding of his rights, which is not the case here.  See, e.g., Cubas v. State, No.
AP-74953, 2005 WL 3956312, at *3 (Tex. Crim. App. Apr. 12, 2006) (not
designated for publication) (reasoning voluntary waiver existed when defendant
indicated that he understood his rights and declined to ask any questions about
them); Alvarez v. State, No. 
02-07-00457-CR, 2009 WL 112783, at *3 (Tex. App.CFort
Worth Jan. 15, 2009, no pet.) (mem. op., not designated for publication)
(concluding voluntary waiver existed when record demonstrated that the
defendant indicated understanding of the warnings by nodding twice during the
warnings and by responding Ayes,
sir@
when informed that by answering, he would be doing so of his own free will); Solis-Reyes
v. State, No. 13-07-00322-CR, 2008 WL 1822636, at *4 (Tex. App.CCorpus
Christi Apr. 24, 2008, no pet.) (mem. op., not designated for publication)
(declaring voluntary waiver when the defendant was read the warnings in Spanish
and indicated he understood the warnings). Montoya seems to argue that, because
he did not expressly waive his rights or expressly acknowledge that he
understood his rights, his waiver is invalid. 
We disagree. 

The
test for determining the validity of a waiver is not whether the defendant
expressly waived his rights or expressly acknowledged his understanding
of his rights; instead, the test is whether, based on the totality of the
circumstances, waiver was given Awith
a full awareness of both the nature of the right being abandoned and the
consequences of the decision to abandon it.@  See Moran, 475 U.S. at 421, 106 S. Ct. at
1141.

Our
review of the video indicates that immediately after a full and complete
reading of his 38.22 rights, Detective Lundy sought a waiver of these rights by
asking Montoya, AAre you willing to tell [me]
what happened last night?@  Although Montoya did not respond until after
the second request, he did respond Ayes@ and
appears to have willingly discussed the events with Detective Lundy.








Moreover,
the trial court found, and we agree, that Montoya Acommunicated
back and forth with Detective Lundy, through the interpreter, a great deal
during the interview.  There was never a
moment where communication broke down or [where Montoya] appeared
confused.  He answered appropriately, in
proper context, to all the questions he was asked; indicating knowledge and
understanding.@  One could reasonably infer that if Montoya
understood the questions being asked of him during the interview, he also
understood the reading of his rights and the consequences of abandoning those
rightsCnamely,
that he had the right to remain silent and that anything he said could be used
against him at his trial.  Thus, based on
the totality of the circumstances, the trial court did not abuse its discretion
by finding that Montoya=s waiver was given with a
full awareness of both the nature of the right being abandoned and the
consequences of the decision to abandon it.

D.  Conclusion

Because
the interpreter=s translation of Montoya=s
rights is the fully effective equivalent of those stated in the statute and
because Montoya intelligently, knowingly, and voluntarily waived his rights, we
hold that the trial court did not abuse its discretion by admitting the videotape
of Montoya=s
confession.  Accordingly, we overrule
Montoya=s
second point.

V.  Conclusion

Having
overruled both of Montoya=s points, we affirm the
trial court=s
judgment.

 

 

BOB MCCOY

JUSTICE

 

PANEL: 
LIVINGSTON, C.J.; DAUPHINOT and MCCOY, JJ.

 

DAUPHINOT, J. concurs in part and dissents in
part without opinion.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED: April 22, 2010











[1]See Tex. R. App. P.
47.4.





[2]Rosa=s son and Claudia=s eight-month-old
daughter also lived in the apartment.





[3]Claudia=s eight-month-old
daughter was also in the room.





[4]Medical evidence
showed that Isaac died from a stab wound that penetrated five inches into his
chest, through the fourth left rib, the top left lung, and the aorta.





[5]Miranda v. Arizona, 384 U.S. 436, 86 S.
Ct. 1602 (1966).





[6]It is unclear from
the record whether Aabout 20A is referring to
weight or dollars.





[7]At trial, Montoya
objected to the voluntariness of his statement on two groundsCfailure to
acknowledge his understanding of Miranda and Detective Lundy=s alleged promise of
leniency.  Thus, to the extent Montoya
asserts that his statement was involuntary because Ahe was still under
the influence of cocaine and/or alcohol at the time of his interrogation,@ he has failed to
preserve this issue for review.  See
Tex. R. App. P. 33.1(a)





[8]Although section 6
does not require that there be a fact dispute, it does require that
evidence pertaining to the issue of voluntariness be submitted to the
jury.  See Oursbourn, 259 S.W.3d
at 175.  How else is the jury to know
that there is a voluntariness issue if, as in this case, it does not receive
any evidence as to the alleged promise of leniency?